977 F.2d 580
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CENTRAL QUALITY SERVICES CORPORATION, Plaintiff-Appellant,
Cross-Appellee,
v.
INSURANCE COMPANY OF NORTH AMERICA; American Insurance
Company; Fireman's Fund Insurance Company; Centennial
Insurance Company; International Insurance Company; and
Federal Insurance Company, Defendants-Appellees,
St. Paul Fire & Marine Insurance Company,
Defendant-Appellee/Cross-Appellant,
American Casualty Company of Reading, Pennsylvania; Ohio
Casualty Insurance Company; and Centennial
Insurance Company, Defendants.
 Nos. 90-1991, 90-2137, 90-2221 and 90-2252.
 United States Court of Appeals, Sixth Circuit.
 Oct. 16, 1992.
 
 Before ALAN E. NORRIS and SUHRHEINRICH, Circuit Judges, and HULL, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Central Quality Services Corporation ("Central"), brought an action seeking a declaration that it enjoyed coverage under policies of insurance from defendant insurance companies. It claimed that coverage was triggered when the Environmental Protection Agency ("EPA") notified Central that, as a "potentially responsible party" ("PRP"), it might be held responsible for the cost of cleaning up a hazardous waste site, as provided by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-9675.
 
 
 2
 Central operates an industrial laundry plant in Traverse City, Michigan. Between 1968 and 1987 it also carried on dry cleaning operations at the plant.
 
 
 3
 On June 2, 1986, Central received a letter from the EPA advising it that
 
 
 4
 [b]ased on data we received during our investigation concerning the hazardous substances at [the plant] site, EPA has information that indicates your firm may be a responsible party.... You should be aware that under Section 107(a) of CERCLA, where the Agency uses public funds to achieve cleanup of the hazardous substance, you may be liable for all costs associated with the removal or remedial action and all other necessary costs in cleaning up the site, including investigation planning and enforcement.
 
 
 5
 After the companies that had insured Central over an eighteen-year period refused its demands to defend, Central brought an action for declaratory relief. The complaint alleged that "actions and notification of the EPA, under existing law and regulation, may ultimately render the Plaintiff liable for the cost of the [feasibility studies], other investigation, remedial measures, monitoring and maintenance, damages, fees, and other actions or costs and expenses." Central asked this court to declare that defendants were obligated to defend and to cover all the costs of defense and indemnification resulting from the EPA's actions.
 
 
 6
 The EPA's investigation stemmed from its suspicion that certain chemicals Central used in its dry cleaning process had leaked into waste water and cleaning sludge that Central had disposed of in evaporation lagoons, a dry well, a stream, a nearby swamp, and a landfill. State officials had expressed their concern with these disposal practices as early as 1974. In addition, two lawsuits were filed against Central in 1978 by neighbors who claimed its use of chemicals was contaminating the area. These lawsuits were settled when Central agreed to pay money damages and dig new wells for the families.
 
 
 7
 In their motions for summary judgment, the insurance companies raised numerous defenses. The district court granted summary judgment to the insurance companies. Central appeals from the district court's orders. Defendant St. Paul Insurance also filed a notice of appeal.
 
 
 8
 The primary question raised by the appeal is whether the terms of the insurance policies obligated defendants to defend Central in response to the EPA letter declaring Central to be a PRP. All of the policies include similar language to the effect that the companies have the duty to defend "any suit" against the insured seeking damages on account of personal injury or property damage. The question before the district court, then, was whether a PRP letter is a "suit" that triggers the duty to defend. The district court answered the question in the negative.
 
 
 9
 Recently that same question was answered in the negative by another panel of this court in Ray Indus., Inc. v. Liberty Mut. Ins. Co., Nos. 90-2152/2220, slip op. at 12 (6th Cir., Sept. 10, 1992). That holding is dispositive of our consideration of the identical issue raised in this case. Salmi v. Secretary of Health and Human Servs., 774 F.2d 685, 689 (6th Cir.1985); Meeks v. Illinois Cent. Gulf R.R., 738 F.2d 748, 751 (6th Cir.1984). Accordingly, the district court correctly determined that the PRP letter was not a "suit" which triggered the defendants' contractual duty to defend or pay costs of defense.
 
 
 10
 Although the opinion in Ray Industries to a large extent disposes of Central's appeal, we will comment briefly on the district court's other rulings.
 
 Costs of EPA Action as Damages
 
 11
 In its complaint Central alleged that the EPA had advised it that the agency would undertake remedial investigations and feasibility studies, as well as other corrective measures and that existing law might render Central liable for the cost of this EPA action. Central contends that defendants were required to pay it for any such costs for which it was held responsible.
 
 
 12
 Several of the defendants defended on the basis that they were not obligated to pay costs that Central might have to pay as the result of being identified as a PRP, because those costs do not qualify under policy language as sums which an insured becomes obligated to pay "as damages." The district court agreed, concluding that
 
 
 13
 [n]othing on the face of the insurance policies obligates the insurers to indemnify plaintiff for any costs it might incur in any manner other than a court proceeding. Since a PRP letter does not constitute a suit, and since "damages" can be incurred only as a consequence of a suit, it follows that any costs incurred as a result of being served with a PRP letter cannot be considered "damages."
 
 
 14
 In view of the policy language concerning "damages," our holding that a PRP letter is not a "suit," and, finally, because there is no indication in the record that the EPA has filed suit against Central to recover any of these costs, we need not reach this issue. We express no opinion concerning whether such costs would be considered "damages" within the contemplation of the policies should the EPA sue to collect them.
 
 Known Risk
 
 15
 Central disputes the district court's decision granting summary judgment to some of the defendant insurance companies because Central "knew of the risk" prior to entering into the insurance contracts. Given the policy language at issue, we agree with the district court's conclusion that the "known risk doctrine" applies under the circumstances of this case. Accordingly, with one exception, we affirm the district court's application of the known risk doctrine for the reasons provided by the court in its Memorandum Opinion of September 6, 1989.
 
 
 16
 The exception to which we refer concerns the issue raised by St. Paul's notice of appeal. In its Memorandum Opinion, the district court concluded that
 
 
 17
 [f]or these reasons, as well as the lawsuits filed against [Central] in 1978, [Central] knew or should have known that there was a substantial probability of a loss due to perchloroethylene by the end of July 1978. Further, the facts indicates [sic] that [Central] knew or should have known by February 23, 1979 that it was considered the likely source of the trichloroethylene contamination despite the fact that it did not knowingly use that chemical. Under these circumstances, the known risk doctrine applies, and the insurance policies purchased by [Central] do not afford coverage for [Central's] known risk of perchloroethylene pollution at the [Central] site as of July 1978, nor for its known risk of trichloroethylene contamination as of February 1979.... As to the trichloroethylene contamination, St. Paul shall be granted summary judgment only on policy no. 521JK2080, covering the time period from September 29, 1979 through September 29, 1980. (Footnote omitted.)
 
 
 18
 The result of the district court's conclusion was that St. Paul was held to have afforded coverage for trichloroethylene contamination in its policy issued on September 29, 1978. In its appeal, St. Paul points out that Central received notice of trichloroethylene contamination earlier than that date, because a lawsuit filed by the Willette family on July 5, 1978 charged Central with polluting its water well with both trichloroethylene and perchloroethylene. The district court's selection of the February 23, 1979 date apparently is based upon a letter from the state department of natural resources of that date indicating discharges of both chemicals. Earlier in its opinion the district court recognized that the Willette suit was filed prior to St. Paul's issuance of the policy and that the suit charged contamination with both chemicals. However, when the district court wrote the language quoted above it apparently overlooked the filing date of the Willette suit as well as the fact that the suit alleged contamination from both chemicals. Accordingly, St. Paul's issue is well-taken and the judgment of the district court is reversed to the extent that the summary judgment to St. Paul on the known risk doctrine should not have been limited as set out on page forty-three of the district court's Memorandum Opinion.
 
 
 19
 For the reasons stated above, the orders of the district court are affirmed in part and reversed in part, and this cause is remanded to afford the district court the opportunity to amend its judgment concerning the appeal of defendant St. Paul.
 
 
 
 *
 The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennessee, sitting by designation